Good morning. Madam Clerk, please read the name of the first case. 122538. A.G. Cullen Construction, Inc. v. Burnham Partners, LLC. 122538. A.G. Cullen Construction, Inc. v. Burnham Partners, LLC. Will the attorneys please approach and identify yourself and how much time you wish. Richard Towson, K-A-L-S-O-N, of Babs, Maryland, on behalf of Plaintiff Appellant A.G. Cullen. And 14 minutes in rebuttal. That would leave me one minute for rebuttal, correct, Your Honor? You can have a few more if you wish. I mean, we're not, we don't have anything after this, so if you go a little long, same for you. Thank you, Your Honor. James Cooney on behalf of the Appellees, Burnham Partners, Lori Halpin and Robert Halpin. And my guess is I'll only need about 10 minutes. And I appreciate it. You're both from Pittsburgh? We are. Yes. And no problem getting here? No problem getting here. Well, we're glad for that. We have beautiful weather here in Chicago today. The microphone is for recording. All the arguments are audio recorded. So please keep your voices up. The presiding justice, Justice Lavin, had a death in the family and today is a funeral. And he will listen to the audio tape. And I know we all express our condolences to Justice Lavin and his family. You may proceed. Thanks for the extra time. Do you want us both? No, no, you can have a seat. Good morning, Your Honors. This is Richard Kallsen of Babs Calland for Appellant Plaintiff A.G. Collin Construction. I'm sure you've read the brief, so I don't want to overindulge you with background on this matter. This was a construction action in Pittsburgh. It was tried before the Honorable Vanessa Hopkins of the Cook County Court on July 31. And the reason we're here today is there are a series of errors that are all interrelated. The five errors that we appeal from are interrelated, and they all lead collectively to the improper verdict against A.G. Collin Construction. For a way of background, this case was tried to the AAA in July of 2007, verdict in September of 2007, filed with the AAA in 2006. And those dates are very important as concerns when the transfers were made from Westgate to Burnham and from Burnham to the Halpins. And some of the transfers went directly to either Mr. or Mrs. Halpin. That's correct. That's correct. And they all went in April of 2007 through July of 2007, including the last funds of this company were dissipated just days before the AAA arbitration started. All of these funds were dissipated in their entirety after, well after the AAA case started up to a few days before the actual hearing. In the context of the arbitration, did Collin engage in discovery? We did engage in discovery, Your Honor. And what's interesting about that point is the same documents that were not produced in the Cook County case as concerns the services allegedly provided by Burnham to Westgate to justify the $400,000, those items were requested in the AAA case and they were requested in Cook County and they were never produced in either case. And what's telling about that is at the time that Mrs. Halpin, an experienced former paralegal at a large Chicago litigation firm, probably lost these documents sometime around 2007, it was after they were already requested in the AAA matter. So these documents, which we don't believe ever even existed, were failed to be produced in two different actions, including one before the alleged loss of the documents. What documents then specifically are they talking about when they talk about the two moves in 09 and 11? And then some things disappeared there as well. Is there anything different about what might have disappeared in 09 and 11 from what was not available in 07? We're talking about the same thing. We're talking about the same documents. 09 and 11 don't mean anything. Because if you didn't have them at the arbitration, which preceded 2009, then their explanation to the court that we moved twice and lost things is non-secular. No, that's definitely correct, Your Honor. I just want to be very careful about one thing. All the construction-related documents we would have requested, to be fair, the note that we don't believe ever existed, the evidence of the alleged personal loan, that would not have been requested in the arbitration. But the rest of the documents primarily were requested, and that would go to the alleged services, invoices, et cetera, provided by Burnham to Westgate. And at the arbitration, the excuse presented for not having the note? Well, the note was not the note request. Excuse me. For not having the other documents. At that point, we were told that they didn't exist. And, in fact, Mr. Halpin, during his testimony, said he didn't know whether they existed at any time or not. Nobody really knows how or if they were even lost. What you have to understand is, during the AAA arbitration, and it's in the transcripts, Mr. Halpin gave a deposition as the sole partner of Burnham, in which he claimed that he really knew nothing at all about the project, because that was very convenient for him at the time of the construction arbitration. Later on, somehow, five years later, he decides that Cullen's claim wasn't valid, and that's why he didn't save any money for it. And it's just not believable. So your questions lead me into the adverse inference and really take us through it. There's an interesting case that came out from this district, but the second division on December 2, 2014, that really, I think, controls just about all the issues. This is from last month, December 2, 2014. A case called Northwestern Memorial Hospital against Sharif, S-H-A-R-I-F. I see you nodding. Perhaps you're familiar with the decision. 2014, ILAP, first 133008, and 2014, WL6790032. This case is almost on all fours with ours. Let's talk about how it deals with adverse, with document destruction. In this case, we have, once again, a husband siphoning off all the assets of a corporation around the time of judgment and giving it all to himself and his ex-wife based on an alleged $10 million note that was never produced. His excuse was, well, it's in my accountant's possession.  And the court rejected the possibility of that note existing because it was never produced. Was Sharif a bench trial or a jury trial? It should be right up front. Yeah, I'm sorry. I'm not seeing it. May I hand it? It reads like a bench trial, but I don't want to lose my credibility if I'm wrong on that issue. But it reads like a bench trial. So in Sharif, the documents are disregarded because they don't exist here. We not only have, first of all, the inference should have been granted because of the criticality of the documents that we already discussed that weren't produced. Instead, what we have here is that the judge accepted them in evidence based on testimony. And what Sharif says is a failure to present unbiased testimony for documentary evidence such as the requested loan documents was insufficient. Here we don't have any unbiased testimony concerning the existence of loan documents. All we have is Mr. Halpin saying they exist. He allegedly had this loan with Northern Trust. He could have called Northern Trust to testify. He could have subpoenaed Northern Trust to get the documents. We don't believe the loan documents ever existed. We believe a negative imprint should have been provided. And we believe that certainly the evidence shouldn't have been accepted as if it existed. It's two levels of a loan. It's the loan from Northern Trust to the Halpins, and then the Halpins claim to have loaned the $175 to Westgate to fund its startup expenses. And the second loan, there isn't any evidence of it. That's correct. I don't recall evidence of either one of them. That's my recollection three years later. So by accepting this evidence as fact that was never provided, that is what the judge relies on to defeat the fraudulent conveyance claim. And what's very key about that is the judge then uses the defeat of the fraudulent conveyance claim to defeat the piercing the corporate bail claim. Because as she says in her decision, if I were to found a fraudulent conveyance, in essence in all likelihood I would have found a bail piercing. So I think that covers the negative inference. There also weren't any documents produced showing observation of corporate formalities such as meeting minutes, corporate resolutions. There simply wasn't anything produced that showed Westgate to be an independent entity. And those documents were asked for in 07? No, those documents were only asked for. Wait, I take that back. Some of them were asked for in 07. So at least you already knew the argument that they were making. Right. What we asked for in 07 were all construction documents. And that would have included these reports that were in all the receipts that were allegedly created by Burnham every month on behalf of Westgate to justify, first of all, the payment of $5,000 a month. And secondly, this outrageous payment of $400,000 in April of 07. There should be some proof of what Burnham did to earn those fees. We haven't seen any. And that was all requested in 07 because we asked for all the construction documents. The Halpins or Mr. Halpin takes the position that a development fee to a related corporation in a construction project like this is not unusual, that he always gets a development fee. If that's the case, worst-case scenario, Burnham is on a par with your client in terms of distribution. Correct. Okay. Correct. I'm not disputing that he is not owed some development fee. What I'm arguing is there isn't any documentation to justify the $400,000 payment. There isn't any documentation to justify the $120,000 payment on the note. And there isn't any documentation to justify the $5,000 a month payments from Westgate to Burnham during the project itself. Those don't exist. And perfect segue into the Delaware statute argument, Your Honor. You mentioned that they would be on par with Cullen. I agree with that. And with the Delaware statute at 18804, remember that this Westgate to Delaware corporation provides, is that there are pro-rata payments for creditors of equal priority. So, therefore, even if Your Honor would accept that these monies were owed to Halpin and Burnham, which we don't in their totality, they should have received the same payment on the debts that Cullen did. And what we see here is every single possible creditor, including the, of course, the insiders, are paid. Cullen is the only creditor left holding the bag here. And what Thompson v. Williams says is you can't prefer one creditor over another in bad faith, especially where sufficient assets are not retained to cover the debt. And here what we have, the final dispersal is about $70,000 right before the hearing. We still don't know why that was transferred. It was in an account. It was the last money. Let's sweep it out and give it to ourselves. There wasn't even a claim that that was illegitimate debt other than let's give it to ourselves. As Mrs. Halpin says, Westgate is Burnham. Burnham is robbed. They're all the same thing in her deposition testimony. These are all the same thing. And that really permeates the whole business arrangement here. Here again, likewise, says insolvent debtor controlled by an agent. You pay your insider debts in full first without making provisions for the other creditors. That's simply not allowed. What's unusual about the decision is the court really doesn't properly consider 18-804B, our argument, but it cites the 18-804A, which simply says creditors must be paid first, including members. That's fine. Under the Delaware Act, we're not asking for exclusive payment. We're asking for parata payment, and we think we're entitled to that. A is irrelevant. What? A is irrelevant. Yes, it is irrelevant. Here it's B and C. Correct. That are meaningful. Correct. And she cites to A. Let me ask you about in some of your legal theories, the $400,000 to Burnham would simply be added back in, that Burnham would not be entitled to it. Correct. You've got the argument under the Delaware law, the Pennsylvania law, and fraudulent conveyance, breach of fiduciary duty. So the relief you're seeking is judgment in favor of your client based on the evidence presented at trial. What is the judgment? Is it to distribute the assets of Westgate that existed prior to the arbitration on a pro rata basis, or is it to distribute the assets excluding the $400,000 to Burnham to your client? No, what we see is that after S&T Bank who was secured is paid first, there was a group of assets left. We would ask for a judgment in our favor of 457 plus the interest, whatever that number is now, and then an accumulation of all assets that were not paid to S&T Bank, and we would get a pro rata share of that. And the reason being is once S&T Bank is paid under the law, Westgate becomes insolvent. There aren't enough assets at that point to pay all the debtors. And at that point, we believe that a pro rata distribution should be paid. But you have a judgment against the individuals. If it's reversed, it would be the individuals, not Westgate. Right. We have a judgment against Westgate, who is now in bankruptcy. Right. We would want a judgment against Burnham and the individuals. And the individuals. Right. And then you would go after them in the – how does that then – because – Well, to the extent that Burnham – I mean, you're not asking – I think you don't want help. You're asking for a judgment. You're not asking to help them pay it directly to you. You're saying it should go into the bankruptcy back to – I think that that's the reality of what would happen. Certainly, if Halpin paid us directly or Burnham paid us directly, we would accept it. But I think in reality, Your Honor, your machination is probably what would have to happen. Go ahead. The scenario would be that we rewind the clock and Westgate has $650,000 left after it pays the bank. And based on the pro rata allocation under Delaware law, the Halpins would get X, Burnham would get X, your client would get X. Is that how – Right. And to the extent that – and this is obviously a fear six years, seven and a half years later – that his client doesn't have the money anymore, I think we would – if they cannot return the funds to the bankruptcy court or are unwilling to, I think we would have every right to have a judgment entered against them at that point. Did you ask at the trial court that the money be paid to the bankruptcy court for – There were extensive pretrial discussions in that case. The file was somewhere in storage in Cook County, so we actually spent a day and a half with Judge Hudgens before we started. I believe that was discussed. I can't say that I precisely remember. But that wasn't what you were asking for in your complaint. No, because at that point, we didn't know all this. We didn't know what had happened. We didn't know – this goes to the concealing. When we filed our complaint in 2007, we didn't know. That was the arbitration. We filed our complaint immediately after the arbitration. So when we filed our complaint in 2007, we didn't know about the fraudulent conveyances because, guess what, they were concealed from us. But you knew later on, so you can always conform your complaint. Did you file it? Did you amend? We did amend a few times, Your Honor. I don't remember precisely what it was amended to. I just don't remember. So do I still have time? Yeah, go ahead. Okay, great. On the fraudulent conveyance, Judge Hudgens – Hopkins. Hopkins, I'm sorry. This cold is killing me. She applied a standard of undisputed evidence to find that we were not entitled to prevail on the fraudulent conveyance. That's the incorrect standard. It's provided without citation, and it's just about impossible to prove. The correct standard would be a preponderance of the evidence, and we think we fulfilled that. And like the incorrect decision on the spoliation standard, this had a wide-ranging domino effect because, as the Court said, and I quote, if this Court were to find that a fraudulent transfer had occurred, then there would be a strong presumption – and this is on page 14 – there would be a strong presumption for piercing the corporate veil under the alter ego theory. Well, let's talk about the fraudulent conveyance. First of all, we have the incorrect standard that Judge Hopkins stated on page 12. Well, regarding that, I mean, she does go on in the next paragraph and say, based upon the evidence presented, there is insufficient evidence. So, I mean, it doesn't say that was a standard that she was using. She just uses the word, failed to induce undisputed evidence. I'm not sure what she was getting at, but the next paragraph, doesn't that kind of tell us that she feels that there just wasn't sufficient evidence? I didn't read it that way, but I think in any event, I think that, first of all, there was exceptional evidence to show that they were not bona fide entities. I mean, that's the more important question, isn't it? Right, and the evidence she relies on, remember, are primarily documents that were never produced. She takes Mr. Halpin's very contradictory testimony as to whether these corporate records existed that were never produced. She's allowed to make those decisions, isn't she? Who to believe, credibility, the testimony. But in this case, I think that the adverse inference should have been granted and that testimony should, there should have been a negative inference against it and it should have never been considered. That's the domino. What we have here is the adverse inference to the fraudulent conveyance to the piercing of the corporate veil. Once we make the incorrect decision on the adverse inference, that leads to the incorrect decision on the fraudulent conveyance, which leads to the incorrect decision on the veil of piercing. So if we reverse on the first issue, the adverse inference, you're saying that we would necessarily, because of that, need to reverse the other two issues? Absolutely, yes. And we can't affirm that and not reverse the others. That would be to put it another way. So if we said we affirm on the insufficient evidence of the adverse inference, then you lose. No, I'm not saying that at all. What I'm saying is if you reverse on the adverse inference, automatically you've got to reverse on the fraudulent conveyance and the veil of piercing. Even if you affirm on the adverse inference and allow that evidence to be considered, you still have to look at the facts. You still have to look at the Northwestern Memorial Hospital case and how it fits squarely with this case. You have to look on the fraudulent conveyance that under the Illinois Fraudulent Transfer Act, a transfer is fraudulent regardless if the transfer was made with actual bad intent. What this case says, one of the big arguments that the defendants made, that the judge accepted was, is that you can prefer a creditor. Okay, even if you believe that, you still cannot make a transfer, and this is what Northwestern speaks to, you cannot make a transfer even with the best intent in the world, which certainly did not exist here, but you cannot make a transfer even with the most operative intentions. That transfer can be set aside as fraudulent if the transfer hinders, delays, or defrauds. So even if you don't believe we were defrauded, which I strongly disagree with, there is still a hindrance and delay because by removing all the assets, we were hindered from being able to collect what was owed to us. So in this case, where an insider of an insolvent corporation makes a transfer which depletes the assets of the insolvent debtor, the transfers are fraudulent because they hindered the right of the plaintiff to collect the debt. And what the court goes on to say is... But we can read it. Yeah, so you get the point. But the point is, even if you believe that you can have a preferred creditor, which there's not unanimity on, but even if you accept that argument, the fact that what you do delays or hinders and leaves no assets left, it's a fraudulent conveyance. I'm still not clear about the result because under one theory, under a fraudulent conveyance and bail piercing theory, you would say Burnham isn't entitled to anything because they didn't document it, because they didn't show that they performed services entitling them to that payment. And so you would take Burnham out of the equation in terms of distributing the assets of Westgate. Under your Delaware theory, Burnham is still in the picture and the assets are distributed on a pro-rata basis. Doesn't that make a difference? Well, I think there are alternate forms of relief that were requested, Your Honor. As you framed it, that is how we framed it. But under one scenario, under the fraudulent conveyance and piercing the corporate bail, your client gets paid in full. That's correct. Under the Delaware scenario, you get paid whatever the pro-rata distribution is. That's correct. So doesn't your client have to elect what you want this court to do? Well, I don't know. Because if we reverse, the trial court then has disparate claims for relief. What's the trial court supposed to do? I think it depends on what your reversal is. So, for example, if you reverse on the Delaware but not on the fraudulent conveyance, we're at pro-rata. If you reverse on the fraudulent conveyance and the bail piercing, we're at payment in full. If you reverse on everything, then we're at payment in full. So I think I covered the Northwestern case. And the one thing I would say is there are the badges of fraud that are set forth in the statute. There are 11 of them. We believe conservatively we hit eight. Appellate courts have said even if you hit four or five, it's fine. And there just isn't any analysis of the bail piercing. I'll try to get through the corporate bail really fast if I still have time. Go ahead. I'll be real fast. I think we actually discussed the corporate bail and how we didn't observe corporate formalities. On the fiduciary duty, there's one interesting issue that I want to bring to your attention before I sit down. A number of Illinois courts have said that you, as an individual creditor, can bring a lawsuit against a corporate officer for a breach of fiduciary duty when he depletes the assets of the insolvent corporation, especially to his own benefit. What the counter theory is in Illinois is that it wouldn't be fair for one creditor to have that right and for all the other creditors not to share in that right. And that's why the courts have, to some extent, discouraged that breach of fiduciary duty claim. And that was discussed in the Fisher tool, the Stampede tool case, from the Northern District of Illinois Eastern Division on June 26, 2014, at 2014 Westside 2932168. What I found interesting about this case is the court relied on the fact that it wouldn't be fair to the other creditors if one got this preferred treatment. Here, that doesn't apply. We're the only creditor, so I think that we should be able to maintain the fiduciary duty claim. And I thank you for your attention and reading the brief so carefully. Mr. Cooney, you can take more than ten minutes if you wish. No, I don't want to hold you to the ten minutes. Good morning. James Cooney on behalf of the appellees. Rather than start with the adverse interest, I want to start with two primary misconceptions, which I believe my opponent, Mr. Colson, has. Number one being that he seems to argue in both his brief and at the oral argument today that the primary issues are governed by issues of law. We believe that most of the issues cited in this case were issues of fact, which gives the trial court very, very strong deference in this case. She was the one that determined who had the credibility, and it's very, very obvious from a reading of her opinion that she found that Mr. and Mrs. Halpin were credible, whereas Mr. Cullen was not. And I think that's what's driving the opinion in this case. The other misconception. Mr. Cullen didn't have anything to say about the existence of corporate records because he didn't have access to them. That wasn't an issue that his credibility determined. Agreed. Aside from that issue, which is the adverse interest issue. Isn't that a pretty important issue, the existence of these corporate records? Well, if Your Honor would prefer that I address that first, I'd be happy to because I do have a response. Well, I don't want to throw you off course. But that seems to be a linchpin. I would agree to a certain extent. The other misconception, and this is very, very basic to this case, is that Cullen seems to take the position that both Burnham Partners and Robert Halpin and Lori Halpin are somehow bound by the arbitrator's award that was issued in Pennsylvania. It's very important for this Court to realize that Burnham Partners was not named as a party to the arbitration case. The Halpins were not named as a party to the arbitration case. They are not bound by the decision. Well, how if Robert Halpin held a 90% interest in Westgate, the party to the arbitration, how is it that he's not bound? Robert Halpin never owned a 90% interest in Westgate. Oh, I'm sorry. He owned a 90% interest in Burnham. Burnham was the controlling entity. Correct. And Mrs. Halpin testified pretty clearly that Westgate, Burnham, and Robert Halpin are all the same. Mrs. Halpin also testified very clearly that she had nothing to do with any of these companies or this project. She was not a member. She was not a shareholder. She had nothing to do with this project whatsoever. The only thing she did was write some checks on a part-time basis for Mr. Halpin. She called herself out on LinkedIn as the director of operations. The court found that she really had nothing to do with this company, and the court accepted her testimony to that effect, that she, in fact, had another position with another company. So to say that she is somehow bound by an arbitrator's award rendered against a company. But we wouldn't be saying, I mean, this case, you're absolutely right. I mean, your statement is that the arbitration award is not against the defendants in this case. That's correct. That's right. But that doesn't mean that the defendants in this case, if he has a cause of action against those defendants, he can get a judgment against those defendants. I agree, but he's basing everything upon the fact that the arbitration award is binding against them. That's the way I read his brief. And it's just simply not so. The Halpins strongly disputed that Cullen was owed any money. All of it, all of it. But they didn't know that. The facts, let's start back in 2006. Mr. Halpin receives a notice of arbitration, and the amount in dispute is $360,000. He may say, well, I don't think I owe $360,000. Most individuals on the other side of the dispute deny they owe anything. But that doesn't mean under the Delaware Act that money shouldn't be put aside. I mean, there's nothing in the Delaware Act that says, well, if you don't believe it, don't consider it. You can't just – how do you reconcile that? I'll get to the Delaware Act again, but I just want to finish my point here. On all the contract between Cullen and Westgate said that all invoices of Mr. Cullen had to be pre-approved by the architect or S&T Bank would not fund those invoices. Every invoice that was approved by the architect was paid. But that's not our issue here. I understand. That's irrelevant. I'm giving reasons why these other people that were not parties to the arbitration did not think the award or the claim was valid. Well, but again, I mean, that's not an issue before us in that to me it's under the Delaware law. What the Delaware law says the LLC should have done, it's pretty clear what they should be doing. Well, let me attack the Delaware law, and then I'll go back to the adverse interest. The Delaware law is raised at pages 16 and 17 of my brief. And it says, a member who receives a distribution in violation of subsection A of this section and who knew at the time of the distribution that the distribution violated subsection A of this section shall be liable to the limited liability company for the amount of the distribution. Under this act, Cullen has no standing to make a claim. Only the limited liability company itself may make a claim under section 18804. That's cited at page 16 of my brief. So if the person who controls the limited liability company received the money, the limited liability company isn't going to file a claim, right? I agree with that. Because he controls them, he's not going to file a claim against himself. But he cannot make up a law that's been promulgated by the legislature of Delaware and say, oh, just because the person who controls the limited liability company isn't going to make a claim, I can make a claim in his place. That's not what the law says. It says the only person that has standing is the company itself. There is a case on point. It's cited at page 17 of my brief. It's CML 5 LLC v. Vax. It's out of the Court of Chancery of Delaware. And in that case, similar to the present case, the Court held that only the company has standing. And the reason being is the Court remarked, and I'll quote it, creditors generally are presumed to be capable of protecting themselves through the contractual agreements that govern their relationship with firms. Creditors are often protected by strong covenants, liens on assets, and other negotiated contractual provisions. And that's very apropos to the present case. Here, Mr. Cullen, as a contractor under Pennsylvania law, had the right to file mechanics liens. He waived that right in his contract. He also could have asked Mr. Halpin or Burnham Partners for a personal guarantee, which he did not, and he admitted that at the trial of this case. Simply put, the Delaware LLC law just has no application here. I'd like to get back to the adverse inference, because I know that the Court is troubled by that. First, as to the development fee to Burnham Partners, there is an argument that there is nothing that substantiates that fee. Nevertheless, the Court specifically found in her findings of fact, not a conclusion of law, that Burnham Partners did much work in order to earn that development fee, and that it was standard in the industry. What did she base it on? What did she base it on? On Mr. Halpin's testimony, that Burnham Partners actually located the land where this project was developed. It located a tenant for the land. It located a contractor, being A.J. Cullen. It got all the necessary government permits and authority to do what it did. It got the bank financing. What about the Northwestern case? Pardon? The case that counsel cited. Were you aware of that case? I'm not specifically familiar with that case, Your Honor. Do you want to have time to file a short? I'd be happy to, yes. I mean, if you do allow that, it comes to file a short reply. Okay. I don't want anybody to be caught off guard. Again, I believe that there is ample testimony in the record to support the development fee that was paid to Burnham Partners. As to the evidence, and this was another thing, the evidence of the loan from Robert and Lori Halpin of $175,000 to get this thing off the ground and get the funding started, to say that that document wasn't produced is just simply not true. Wasn't under the Burnham operating agreement, wasn't Burnham obligated to make a capital contribution? That may be so, Your Honor. So the theory of the Halpins, if I understand it, is Burnham satisfied its obligation to make a capital contribution through money then loaned by the Halpins to Burnham, which was serviced through proceeds generated during this project, but wasn't really a capital contribution. No, it was a loan. And the documents for the loan were produced? The documents for the loan were produced, and I refer, it's in the supplemental record, which was prepared by Mr. Cullen or Mr. A.J. Cullen Construction. It is Exhibit J12 from the trial in the supplemental record. It's tabbed as tab L. It's a note for $175,000 from Westgate Ventures to Robert Halpin and Lori Halpin. It was the money that was used as a start-off money to start this project. So that document – So that transaction was negotiated by Mr. Halpin on behalf of Westgate and Mr. Halpin on behalf of himself and his wife. He's on both sides of that loan. That's correct. But there is documentation of that loan, so there can be no adverse interest. It was produced. In fact, the trial court, in addition to that, found that Westgate presented sufficient evidence that it had its own bank accounts, its own office, and its own accountants. And if you look at the supplemental record, there is a wealth of documents produced by the appellees relative to these issues. They wouldn't have them if they weren't here. These are our documents. We did produce them. We didn't produce them all because some of them were lost. Judge Hopkins found that that was a credible explanation. But talk about the fact that documents relating to the project, including reports supposedly prepared by Burnham justifying the fees it earned for the development, were requested in the arbitration prior to any of these moves that the Halpins relied on, and they weren't produced. Well, Your Honor, I'm not sure what the answer is to that, but I think that the trial judge is in a position to determine credibility, and if Mr. Halpin testified this is what Burnham Partners did to earn its fee and the trial judge found that credible. Other than his visit to the site once a month, what did Mr. Halpin testify to? He testified to all the things that they did, and I'll list them again. They found the land. They found the contractor. They obtained the financing. They obtained the government permits. They found a soils engineer and paid the soils engineer. They found the tenant for the property. And the point, I think, if I understand Colin's argument correctly, is that these were all things that Burnham was obligated to do under the operating agreement, independent of any development. And the operating agreement specifically called for a $400 development fee. $400,000 development fee for those services. That's correct. As to the documents relating to the loan from Northern Trust, I don't think anybody's disputing the fact that there was a loan to Northern Trust and they had to be repaid before anybody would be repaid because they had a first lien on the property. Well, but no documentation was produced? I don't know. Very frankly, I did not handle the arbitration hearing. I did not get involved in this. Well, I'm talking in this case. In this case, I don't recall that there was a subpoena for or a request for documents relating to the S&T loan. But in any event, the plaintiff could have subpoenaed those documents if we did not produce them. I don't think that there was even a request. I could be wrong. I challenge my opponent to show me where I am wrong, but I don't think that happened. As to the fraudulent conveyances, Cohen's biggest argument is that the judge relied upon the wrong standard, which is undisputed evidence. And I believe, I agree with Judge Hyman, that that's not really what she did. She just really said that based upon the evidence presented, that Cohen did not meet its burden of proof on fraudulent conveyances. She makes four references in the record to the burden relating to fraudulent transfers, and I'll read them. No, that's okay. It's in your brief. Okay. They are in my brief on pages 19 and 20. So I don't think that's a very good argument. I think that, again, that's an issue of fact that we can rely upon the trial court. The trial court was in position to judge the credibility of the witnesses, and I think it certainly should be upheld by this honorable court. There was mention of badges of fraud. We have cited case law in our brief that badges of fraud, even if all of them are present, are not controlling. They are just items to be considered by the court. How about the fact that under their account they said 11 of the 14 badges? That's quite a large number if it's accurate. It certainly is. But here we have a credibility finding by the trial court that the defendants were credible and the plaintiff was not. But what about the manifest way to the evidence? That's the standard we're looking at. It's got to overcome the manifest way to the evidence. We just don't think it was there. As to fiduciary duty, that's really a question. Normally it's a question of fact. It can be a question of law. For instance, an attorney clearly has a fiduciary duty to his client. A trustee clearly has a fiduciary duty to the beneficiaries of the trust. But a contractor and a developer working together just because there's a contract does not in and of itself form a fiduciary duty. I don't understand that to be Cullen's argument. Cullen's argument is once Westgate became insolvent and unable to pay its creditors in full, then as a matter of law there was a fiduciary duty. Again, I go back to the trial court's finding that at the time that the payments were made, none of the defendants believed that Cullen was owed any money. Where in the law does it say their belief is the standard that courts should consider? I'm not sure anywhere in the law it says to the opposite either. And again, the fact that Cullen was paid $400,000 or charged for $400,000 in extras on a $2 million job, the fact that Cullen told Mr. Halpin two weeks after the job started that he had underbid the job. Whether he did or didn't, Delaware law says an LLC has certain responsibilities. But you're going back to a Delaware law that Cullen has no standing to enforce. Delaware law says that unless the company seeks the return of the money, the creditor has his own means to protect himself, either through liens, guarantees, or whatever. And Mr. Cullen did not take those steps in this case. There's another two other important factors. If you look at the supplemental record at tab K, it was exhibit J1 in the trial court. It's a letter from Mr. Cullen to Mr. Felix Fucai, who was the architect who was charged with approving his invoices. He's accusing Mr. Fucai of bad faith in his failure to approve the invoices for the extra work. Mr. Fucai did not believe that the work was extra. Why didn't he? But that's been decided by the arbitration. Mr. Fucai was a member of Westgate. He was a 10 percent member. Why wasn't he named in the arbitration proceedings? We'll never know. But we believe that there was some kind of secret deal. It's not part of the work. That's irrelevant. Okay. What are your other, anything else? Yes. Why is Lori Halpin a party to this case in the first place? Mr. Cullen said he never met Lori Halpin. Mr. Cullen admitted he never even spoke to her on the phone. The trial judge found that she had no connection whatsoever with this project, that she had a separate job just because she's the wife of Robert Halpin, who was the manager of the developer, he named her in the suit. When I asked her at trial why Lori Halpin had been named in the suit, he had no answer for that other than it was on the advice of my attorney. So no matter what happens in this case, Lori Halpin should be out. Well, you didn't, you haven't advanced that argument, have you? I don't recall that in your brief. Is that in your brief, that specifically Lori Halpin needs to be dismissed? I think that all the claims should be dismissed. I didn't specifically advance that, no. I did advance the fact on several occasions that she had no ownership interest in any of these companies, that she was not a member, that she was not even an employee, that she was not paid by any of these companies, and that she had a separate job. And in fact, the trial court made all those findings as well on the record. Thank you. Thank you very much. No lawyer has ever said anything in 20 seconds. An issue arose as to what document we said wasn't produced regarding loan documents. And if you look at page 20, number 12 on page 20 of our brief, we said no documents were produced evidencing any loan that the Halpins supposedly took out to make their loan to Westgate, or that Westgate had agreed to pay interest on Mr. and Mrs. Halpin's personal loan. That's the loan we're talking about. Excellent job. 20 seconds. 20 seconds. I can never say that again. So how long do you want to respond to that one case he cited? Ten days. Ten days. Sure. And how long do you want to file a reply? Seven days. All right. Thank you very much. I appreciate both of you coming to town. And I hope you enjoy your stay in Chicago. You both did an excellent job. We have a lot to think about, and that's why we asked for oral argument. The briefs raised a lot of issues. And we will take the case under invite and enter a decision soon. Thank you very much.